IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DON COOK,

        Plaintiff,

vs.                                  CIV No. 20-00739 DHU-SCY

CITY OF ALBUQUERQUE and
OFFICER LUKE MCPEEK,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants City of Albuquerque and Luke McPeek's ("Defendants") Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint. (Defs.' Mot., Doc. 20). Having considered the parties' briefing, the record of the case, and applicable law, the Court denies Defendants' Motion for Summary Judgement Requesting Dismissal of Plaintiff's Complaint.

## I
## FACTUAL BACKGROUND [1]

At 3:38 p.m. on February 28, 2019, dispatch notified Albuquerque Police Department ("APD") officers of an in "progress" pursuit of an armed robbery suspect. [2] (Def's UMF ¶ 1, Doc. 20). At 4:06 p.m., officers were notified that the suspect was last seen at the Zuni and Louisiana intersection in a white Chevy pickup. (Def's UMF ¶ 2, Doc. 20). Roughly ten minutes later,

---

[1] The following facts are either undisputed or construed in the light most favorable to Plaintiff as the summary judgment nonmovant.

[2] AXON body cameras worn by Albuquerque Police Department officers recorded the events on February 28, 2019. The Court describes the facts "in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381 (2007), and construes any recordings gaps and uncertainties in the light most favorable to Plaintiff. *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017).

dispatch notified the officers that a witness saw the suspect enter a junkyard and hide under a car. (Def's UMF ¶ 3, Doc. 20). In response, APD Sergeant Rene Barra ordered that a perimeter be set between Dakota St. SE and Zuni Rd. SE; and Cochiti St. SE and Acoma Rd. SE. Once the perimeter was set, Sergeant Barra dispatched APD K-9 and Tactical Units to the area. (Def's UMF ¶ 4, Doc. 20). Responding officers directed neighborhood residents, who were returning to their residences, to park their cars on the west side of the mobile home park. (Pltf's Resp. ¶ E, Doc. 36).

APD K-9 Unit Sergeant Michael Hernandez, Officer Luke McPeek ("Defendant"), and Officer Phetamphone Pholphiboun reported to the scene at approximately 4:28 p.m. (Def's UMF ¶ 5, Doc. 20).  Upon arrival, Defendant adjusted the perimeter. (Def's UMF ¶ 9, Doc. 20).  He then, in accordance with APD policy, drove around the perimeter at approximately 5:00 p.m. and, using a mounted public address system, gave public service announcements ("PSAs") directing members of the public to stay inside, keep their windows and doors locked, and contact 911 in the event of an emergency. (Def's UMF ¶ 9, Doc. 20).

Defendant also projected a series of K-9 PSAs directed to the suspect. (Def's UMF ¶ 9, Doc. 20). These warnings encouraged the suspect to make his presence known, and informed him that if he failed to do so, then APD would deploy a police service dog ("PSD") who would locate and bite him. (Def's UMF ¶12, Doc. 20).

As the evening continued, Sergeant Hernandez received reports on the suspect's whereabouts and appearance. On the suspect's whereabouts, a witness advised Sergeant Hernandez that someone let the suspect enter the tow yard and closed the gate behind him. (Def's UMF ¶ 13, Doc. 20). In response, Sergeant Hernandez relayed over the radio that officers may be dealing with "friendlies"—persons aiding the suspect in his evasion. (Def's UMF ¶ 13, Doc. 20). On the suspect's appearance, a New Mexico state patrol officer notified Sergeant Hernandez that

the suspect was Felix Apodaca—a Hispanic male in his thirties with short hair and a visible head tattoo. (Def's UMF ¶ 17, Doc 20). Sergeant Hernandez relayed this information via radio and sent a photo from the Motor Vehicle Department of the suspect to the K-9 search teams. (Def's UMF ¶ 18, Doc, 20).

The K-9 search teams unsuccessfully searched within the perimeter between 5:57 p.m. and 7:31 p.m. During that time, the suspect was not located. So, at 7:32 p.m., Sergeant Hernandez broke down the perimeter and the K-9 units left the scene. (Def's UMF ¶ 21-23, Doc. 20).

It was apparent to Plaintiff and other residents who lived within the perimeter, that the officers had left the scene. (Pltf's Resp. ¶ G, Doc. 36). Plaintiff's neighbor, Geraldo Ortega, came to Plaintiff's home around 7:30 p.m. where they both observed that no officers or police cars were anywhere in sight. (Pltf's Resp. ¶ H, Doc. 36). And, because APD cleared the roads, Plaintiff, Mr. Ortega, and other resident neighbors went to the west side of the mobile home park to retrieve their cars. Plaintiff did not observe a single officer while retrieving his car and driving it home. (Pltf's Resp. ¶ I-J, Doc. 36).

Although the perimeter had been removed and the residents had gone back to normal, an officer, who was still present, reported that he saw the suspect proceed from Acoma Rd. SE to Southbound Dakota St. SE. (Def's UMF ¶ 23-24, Doc. 20). In response, APD reestablished the perimeter at approximately 7:50 p.m. and called the K-9 teams back to the scene. (Def's UMF ¶ 23-24, Doc. 20).

When Officer Hernandez returned, the suspect was apparently concealed in a shed in the trailer park to the north of Acoma Rd. SE. (Def's UMF ¶ 25, Doc. 20). The homeowner of the shed where the suspect was located said that the suspect offered him fifty dollars to drive him out of the perimeter. (Def's UMF ¶ 26, Doc. 20). But when the homeowner declined the suspect fled on foot

Southbound on Dakota St. SE from Acoma Rd. SE toward Zuni Rd. SE and officers lost sight of him near an alley in the middle of the block. (Def's UMF ¶ 25-27, Doc. 20). Officers reported to dispatch that the suspect wore a white shirt and blue jeans, but he also had a black shirt in his hands. (Def's UMF ¶ 28-29, Doc. 20). When the K-9 teams returned, Sergeant Hernandez provided them with this updated description and the suspect's last known direction of travel. (Def's UMF ¶ 28-29, Doc. 20).

### A. Deployment of Police Service Dog Gino

By 8:18 p.m., APD had reestablished a perimeter and Defendant provided an additional, general PSA warning about APD activity in the area. (Pltf's Resp. ¶ 2, Doc. 36). Defendant's lapel footage shows that the warning was provided in the general area and neighborhood of Plaintiff's home but does not, by itself, shed light as to whether the warning was sufficient to adequately warn nearby residents of the release of a PSD. Neither Plaintiff, nor his neighbor Geraldo Ortega heard this PSA directing them to stay inside of their homes. (Pltf's Resp. ¶ 2, Doc. 36). It is undisputed that no further PSA or other warnings were given after 8:18 p.m. (Pltf's Resp. ¶ 2, Doc. 36).

Sergeant Hernandez established a plan for two K-9 search teams to search within the perimeter. Officer Pholphiboun led one team and Defendant led the other. (Def's UMF ¶ 32, Doc. 20). Officer James Jacoby served on Defendant's search team positioned at Acoma Rd. SE and Dakota St. SE, and saw a male peek around the corner at 311 Dakota St. SE—Plaintiff's Home. (Def's UMF ¶ 35, Doc. 20). Officer Jacoby ran toward the male, and directed him to make his presence known, show his hands, and stop. Defendant followed Officer Jacoby in a marked police vehicle but no contact was made. (Def's UMF ¶ 36-37, Doc. 20). Defendant then parked his vehicle

and, after parking, learned Officers Jacoby and Jones had seen movement from behind a bush at 311 Dakota St. SE. (Def's UMF ¶ 40, Doc. 20).

Officers believed the movement in the bushes was probably a cat. (Pltf's Resp. ¶ O, Doc. 36). Regardless, Defendant radioed the information in and advised that it could have been a cat, but that it was also where the suspect was last seen. (Def's UMF ¶ 46, Doc. 20). In response to this information alone, Sergeant Hernandez authorized the deployment of PSD Gino.

At this time, it had been approximately thirty minutes since the last K-9 PSA. Defendant knew there was a possibility that homeowners in the area would be outside of their home. (Pltf's Resp. ¶6, R-T, Doc. 36). And Defendant knew that a PSD would bite any person in his vicinity, including an innocent person, that moved. (Pltf's Resp. ¶ 6, R-T, Doc. 36). Still, Defendant made the decision to deploy a PSD for an off-lead search near Plaintiff's home. (Def's UMF ¶ 47-48, Doc. 20).

Defendant did not give any canine warning prior to releasing PSD Gino. The lack of warning left Plaintiff unaware of PSD Gino's deployment. (Pltf's Resp. ¶ 4, Doc. 36). As Plaintiff was locking the gate to his house, PSD Gino ran onto Plaintiff's property and attacked him. (Pltf's Resp. AA, Doc. 36).

Defendant heard somebody screaming and assumed that PSD Gino had apprehended the suspect. (Def's UMF ¶ 57, Doc. 20). However, as Defendant and other officers approached, they saw Plaintiff defensively holding PSD Gino by the collar. (Pltf's Resp. ¶ 9, Doc. 36). Officers, with guns drawn in the "low ready" position, ordered Plaintiff: "Suspect, show me your hands!" and "Get on the ground!" (Def's UMF ¶ 59, Doc. 20). As Defendant approached, Plaintiff yelled, "I live here," while he was still holding onto the PSD by the collar. (Def's UMF ¶ 61, Doc. 20). Defendant moved toward the PSD to secure him and prevent him from biting Plaintiff again. (Def's

UMF ¶ 63, Doc. 20). As he approached, Defendant ordered Plaintiff to let go of the PSD's collar. (Pltf's Resp. ¶ 9, Doc. 36). When Plaintiff complied with Defendant's command, PSD Gino bit Plaintiff for a second time. (Def's UMF ¶ 63, Doc. 20).  PSD Gino's bites left deep wounds on both of Plaintiff's legs. (Pltf's Resp. ¶ FF, Doc. 36) APD K-9s are trained to release a person upon hearing the command "Loos". (Pltf's Resp. ¶ FF, Doc. 36).  Defendant did not give the "Loos" command until after Plaintiff had sustained severe injuries to both his legs. (Pltf's Resp. ¶ DD-EE, Doc. 36).

### B.  Plaintiff's Arrest and Subsequent Search of His Home

Almost immediately after the attack at 8:46 p.m., Defendant announced over the radio that APD had a homeowner who had stepped outside of his house in custody, but that the homeowner did not appear to be the suspect. (Def's UMF ¶ 65, Doc. 20). After making that announcement, Defendant directed officers to place Plaintiff in custody and take him to get medical assistance. (Def's UMF ¶ 66, Doc. 20).

Officer Jacoby patted down Plaintiff before taking him to the Albuquerque Fire Department rescue vehicle. (Def's UMF ¶ 70-71, Doc. 20). At the rescue vehicle, Sergeant Hernandez urged Plaintiff to be examined and treated for his injuries. Plaintiff initially refused because he was concerned about his own dog and whether his house was secured. (Def's UMF ¶ 73-75, Doc. 20). Plaintiff was not allowed to mitigate those concerns before APD ushered him off the scene. At no time before his removal did Plaintiff give officers permission to enter his home. [3] (Pltf's Resp. ¶ JJ, Doc. 36) (Def's Mot. ¶ 76, Doc. 20).

---

[3] Although a dispute exists as to whether officers received permission to enter Plaintiff's home, when construing the facts in the light most favorable to Plaintiff, this Court believes sufficient evidence exists that Plaintiff, at no point, gave Sergeant Hernandez explicit permission to enter his home.

After APD removed Plaintiff from the scene, Defendant returned to the Plaintiff's residence with three other officers. Upon arrival, officers saw that Plaintiff's home had two doors: a primary wood door and a screen door. Although the wood door was open, the screen door was shut. Officers found Plaintiff's cell phone, which had fallen on the ground outside of his residence. Defendant picked up the phone, opened Plaintiff's screen security door, and tossed the phone inside. Defendant then closed both doors and left the home. (Def's UMF ¶ 79-80, Doc. 20).

Defendant and other officers continued to search for the suspect to no avail. (Def's UMF ¶ 80, Doc. 20). On multiple occasions throughout their search, they entered Plaintiff's home. (Def's UMF ¶ 81-83, Doc. 20). During one entry, officers congregated in Plaintiff's living room and watched footage from Plaintiff's personal surveillance cameras. (Pltf's Resp. ¶ WW, Doc. 36).

Plaintiff's girlfriend and his younger sister, both heard what had happened and traveled to Plaintiff's home to pick up Plaintiff's dog and secure his home. They arrived around 9:00 p.m. and were instructed by police that they had to wait until the area was safe to enter. (Pltf's Resp. ¶ XX-YY, Doc. 36). APD eventually escorted the women inside the home, which remained occupied by numerous officers. (Pltf's Resp. ¶ AAA, Doc. 36). After picking up Plaintiff's dog and locking Plaintiff's house, Plaintiff's girlfriend went to the hospital to pick up Plaintiff. As Plaintiff waited for his girlfriend to arrive, Sergeant Hernandez and another officer wheeled Plaintiff from the hallway into an empty room where they questioned him about the dog bites. Plaintiff's girlfriend was prevented from seeing Plaintiff and getting him home until Sergeant Hernandez and the other office were done asking questions. (Pltf's Resp. ¶ EEE-FFF, Doc. 36). When Plaintiff finally got home, it was obvious to him that officers had been inside. (Pltf's Resp. ¶ GGG, Doc. 36).

## II
## PROCEDURAL BACKGROUND

Plaintiff filed his first amended complaint in state court, alleging various state law claims as well as claims for unlawful seizure, unlawful entry and search, and excessive use of force under the Fourth Amendment. (Doc. 1-2). Defendant City of Albuquerque removed to federal court. (Doc. 1). After removal, Defendants moved for summary judgment, asserting defenses of qualified and sovereign immunity. (Doc. 7, at 16). On April 14, 2022, the Court held a hearing on the motion. No witnesses were called by either party.

## III
## STANDARD OF REVIEW

42 U.S.C § 1983 "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 459 (10th Cir. 2013). It "creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205 (2001). "In defending against § 1983 claims . . . an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021).

In reviewing a summary judgment motion based on qualified immunity, the Court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019).

"[The district court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (citing *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.") (internal quotation marks and citation omitted). In considering whether an officer is entitled to qualified immunity, the district court "considers only the facts that were knowable to the defendant officers." *White v. Pauly*, ⸺ U.S. ⸺, 137 S.Ct. 548, 550 (2017) (per curiam).

**IV**

**DISCUSSION**

Plaintiff alleges that Defendant violated his Fourth Amendment rights by: (1) unreasonably deploying a PSD off-lead, without warning, into a residential neighborhood; (2) unreasonably ordering Plaintiff at gunpoint to release the dog's collar without first recalling the dog, thereby prompting a second attack; and (3) entering Plaintiff's home multiple times without permission or a warrant. [4]   Defendant asserts a defense of qualified immunity on each claim. [5] This Court addresses each claim and corresponding defense in turn.

To satisfy the first prong, Plaintiff must show Defendant's conduct violated a federal right. *See Tolan* 572 U.S. at 655-56. To satisfy the second prong, Plaintiff must show that preexisting Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, makes it apparent to a reasonable officer that the nature of his conduct is unlawful.  *See Carbajal v. City of Cheyenne,* 847 F.3d 1203, 1210 (10th Cir. 2017). A case need not be directly on point for a right to be clearly established because fact-to-fact comparison is not required when distinctions in the facts make no constitutional difference. *See Kerns v. Bader*, 663 F.3d 1173, 1186-87 (10th Cir. 2011). Instead, all that is required is "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).

---

[4] Count IV of Plaintiff's First Amended Complaint (Doc. 1-2) brought a claim for unlawful seizure. However, during the hearing held on April 14, 2022, Plaintiff expressed to the Court that they are no longer perusing that claim. Thus, it will not be considered in the Court's discussion of this case.

[5] "Qualified immunity is a judicially-created defense that shields public officials from civil liability based on having acted in good faith in the exitance of their duties." *Gray v. Baker*, 399 F.3d 1241, 1245 (10th Cir. 2005).

### A. Qualified Immunity

#### 1. First Bite

##### a. Constitutional Violation

This Court analyzes whether the force used to effectuate an arrest violated an individual's Fourth Amendment rights under the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). In conducting that analysis, the Court "focuses not on the officers' particular motivations, nor on the arrestee's subjective perception of the intrusion, but on whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). Reasonableness is evaluated under the totality of the circumstances and includes the consideration of the following factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of officers or others; (3) and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. In the determination of reasonableness of an officer's use of force, "personal security and dignity interests, particularly of non-suspects, should also be considered." *Cortez v.* McCauley, 478 F.3d 1108, 1131 (10th Cir. 2007)(en banc). However, the bedrock consideration must be "objective reasonableness based on whether the totality of the circumstances justified the use of force," paying "careful attention to the facts and circumstances of the particular case." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

With that framework in mind, courts have found that an attack by an improperly deployed police dog constitutes an excessive force violation under the Fourth Amendment. *See Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998) (Seizures include "attacks by police dogs improperly deployed by their handlers."). *Id.* at 178. Because a seizure occurred the moment

the PSD bit Plaintiff, the question becomes whether Defendant reasonably deployed that PSD. Plaintiff argues that it was unreasonable for Defendant to release a PSD off-lead without warning in a residential neighborhood, where officers knew bystanders may be in the area, despite not facing an immediate threat or danger. The Court agrees.

When conducting the totality of the circumstances analysis, the Court finds that the circumstances of this event weigh heavily in favor of finding unreasonable use of force. First, even though Defendant was searching for an armed robbery suspect, courts prioritize *Graham*'s second factor more heavily – emphasizing that courts ought give greater weight to the immediate threat posed to officers. *See Graham*, 490 U.S. at 395. Keeping that in mind, none of the evidence provided demonstrates that officers were facing an immediate threat, or that providing a PSD warning would have increased the risk of an immediate threat. In fact, Defendants decided to deploy PSD Gino merely to "check out," or investigate minor movement behind a bush— movement which officers on scene attributed to a cat. The Court recognizes that there may be situations in which circumstances change rapidly, immediacy of danger is present, or where officers, for their own safety or the safety of others, are unable to provide a warning prior to the release of a PSD. However, there is no evidence here to suggest that providing a PSD warning would have put officers at increased risk. While courts recognize there may be exceptional circumstances where a PSD warning is not feasible, there is no reason why, in this instance, one was not provided. *See Kuha v. City of Minnetonka*, 365 F.3d 590, 599 (8th Cir. 2003) ("We agree that officer safety is paramount but disagree…that a verbal warning will put officers at increased risk. To the contrary, such a practice would likely diminish the risk of confrontation by increasing the likelihood that a suspect will surrender."). The immediacy of threat to officers, such that it would justify deploying PSD Gino without warning, has not been made apparent.

Second, Defendant did not deploy the PSD in a targeted fashion. Defendant deployed an off-lead PSD, trained to bite and hold anything that moved, into an unfenced, open and dark residential area. (Pltf's Resp. Doc. 36, ¶ U). The risk of deployment in such a venue was not lost on Defendant. At the time of release, Defendant was aware that there were possible bystanders in the area. (Pltf's Resp. Doc. 36, ¶ R). Despite this knowledge, Defendant released PSD Gino.

Third, the timing of events demonstrates that the Defendant could have issued general and K-9 specific PSAs in the moments before the deployment of a PSD but elected not to do so. PSAs had been given around 4:30 p.m. during the first perimeter, but by 7:30 p.m., after an unsuccessful search, Defendant had left the scene. At this time, residents went back to business as usual. Plaintiff and his neighbor came out of their homes and went to move their cars. Around 8:20 p.m., APD returned and erected a second perimeter. Again, Defendant issued PSAs to residents about police activity in the area. This PSA was issued roughly thirty minutes before PSD Gino was deployed. However, neither Plaintiff, nor his neighbor heard this warning. They believed officers had left for the evening and that they were allowed to go outside of their homes. [6] (Pltf's Resp. Doc. 36, ¶ W). Common sense and reasonableness would suggest that if general warnings had been given earlier in the evening, and broadcast to an entire neighborhood block of residents, that an additional warning targeted at the specific area that the PSD was to be released would be much more effective in achieving its goal. Defendant's lapel footage shows that he had the means, as well as ample time to provide a sufficient warning in the moments before PSD Gino's deployment. (Def's Mot. Doc. 20, Ex. P2 at 1:00 through 9:00). Not only would the warning be more likely to achieve a peaceful

---

[6] Plaintiff's neighbor, Geraldo Ortega lived one house away from Plaintiff. Mr. Ortega was able to clearly hear warnings that were given by officers over the intercom system from earlier in the day, and before the perimeter was broken down and officers left the scene; however, after 6:00 p.m. neither Plaintiff nor his neighbor heard any warnings alerting them to stay in their home. (Pltf's Resp. Doc. 36-3, ¶ 3-10)

surrender, but it would also adequately warn bystanders of the risk at the time of danger. *See* Kuha, 365 F.3d at 599.

The reasonableness of releasing a PSD is not a new issue. Other courts have found that conducting a search with a police dog trained to bite and hold an individual without giving a warning of the dog's pending release and an opportunity to surrender peacefully constitutes excessive force. [7] *See Brown v. Whitman*, 651 F.Supp.2d 1216, 1226 (D. Colo. 2009); *Smith v. City of Albuquerque*, 2002 WL 35649607, *4 (D.N.M. Oct. 8, 2002); *Kuha*, 365 F.3d 590 at 598 ("[t]he presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog"; *Kopf v. Wing*, 942 F.2d 265, 268-269 (4th Cir. 1991) (reversing grant of summary judgment because the issue of whether or not an officer gave a warning regarding the police dog was a genuine issue of material fact.); *see also Burrows v. City of Tulsa*, 25 F.3d 1055, 1994 WL 232169, *3 (10th Cir. June 1, 1994) (unpublished) (holding that a jury could have found the officer's actions objectively unreasonable where a police dog trained to attack was released into a residential backyard without warning.). Conversely, no Tenth Circuit or Supreme Court precedent concludes that a verbal warning is mandatory in every case where a police service dog is deployed. *Thompson v. Salt Lake County*, 584 F.3d 1304, 1321 (10th Cir. 2009) ("A warning is not invariably required even before the use of deadly force, let alone here, where the release of the dog was nondeadly force used in the face of an imminent threat."). Taken together, these cases demonstrate the highly fact sensitive nature of the excessive force inquiry under the Fourth Amendment, generally, as well as in the specific context of use of canine force.

The PSA warning, given thirty minutes prior, may be considered in the totality of the circumstances of Defendant's use of force; however, "[a] juror could reasonably conclude that if

---

[7] A K-9 warning, "is a loud verbal announcement made prior to the release of the dog, which allows innocent persons to exit the area and afford[s] suspects an opportunity to surrender.'" *Vathekan*, 154 F.3d at 176.

certain witnesses did not hear a warning, then no warning was given, even if other witnesses testify to a warning." *Vathekan*, 154 F.3d at 180. For the reasons explained above, the Court finds that a genuine issue of fact exists on whether Defendant's conduct was reasonable and whether the PSA was sufficient to adequately warn those who were at risk from the PSD deployment.

### b.  Clearly Established Law

Next this Court considers whether Defendant's actions violated clearly established law. "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Id.* (citing *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010).

In the absence of a case directly on point, the Court requires that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Quinn*, 780 F.3d at 1004-5 (citation omitted). The Supreme Court has warned that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Thus, courts have adopted "a sliding scale to determine when law is clearly established. The more egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.*

Still, for the law to be clearly established under the weight of authority approach, "a plaintiff must identify more than 'a handful of decisions from courts in other circuits that lend support to his claim.'" *Swanson v. Griffin*, 2022 WL 570079, *2 (10th Cir. Feb. 25, 2022) (citing *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir. 2009)); *See also Routt v. Howry*, 835 F. App'x 379, 385 (10th Cir. 2020) (unpublished) ("[O]nly one case from another

circuit ... is insufficient to constitute the weight of authority from other circuits that is necessary to finding it clearly established that defendants' particular conduct violated [plaintiff's] rights."). In *Wilson v. Layne*, 526, U.S. 603, 617 (1999), the Supreme Court explained that courts should consider "a consensus of cases of persuasive authority" to show that "a reasonable officer could not have believed that his actions were lawful." "In recent years, the Supreme Court has reaffirmed that 'qualified immunity is lost when plaintiffs point either to cases of controlling authority in their jurisdiction at the time of the incident or to a consensus of cases of persuasive authority.'" *Ullery v. Bradley*, 949 F.3d 1282, 1292 (10th Cir. 2020) (quoting *al-Kidd*, 563 U.S. at 742).

Plaintiff does not contend that deploying a PSD to apprehend a suspect is always unreasonable, or even that deploying a PSD without warning is unreasonable in every situation. Instead, Plaintiff argues that it is clearly established that an officer who faces no immediate threat cannot deploy a PSD off-lead without warning. This Court agrees.

Considering whether Tenth Circuit precedent makes it apparent to a reasonable officer that the nature of his conduct is unlawful, this Court finds *Thompson v. Salt Lake City*, 584 F.3d 1304 (10th Cir. 2009), particularly instructive. Although the Tenth Circuit ultimately found that the officers' actions were reasonable, *Thompson* demonstrates which circumstances constitute an imminent threat sufficient to warrant the deployment of a PSD without warning. In *Thompson*, a woman sued claiming excessive force after police released a PSD and shot her husband. The Tenth Circuit held that deployment of the PSD without warning was not an unreasonable use of force because the officers faced an imminent threat. *Id*. at 1321. The husband was drunk, angry, and armed. He had previously pointed a gun at his wife and threatened to commit suicide. He also spoke with an officer who arrived on the scene and threatened that if "he did not want officers to get hurt, he should leave the area." *Id.* To locate the husband, officers conducted a targeted

deployment of PSD into a single backyard. There, the PSD successfully located the husband and bit him.

The Tenth Circuit's holding in *Thompson* aligns with that of other courts. The rule is simple: officers who face an imminent threat do not have to issue a warning before deploying a PSD. Officers who do not face an imminent threat do. *See Vathekan*, 154 F.3d at 179 ("Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context"); *Campbell v. City of Springboro Ohio*, 700 F.3d 779, 789 (6th Cir. 2012) (Plaintiff submitted "ample evidence to suggest that [officer] acted contrary to clearly established law when he used a inadequately trained canine, without warning, to apprehend two suspects who were not fleeing."); *Szabla v. City of Brooklyn Park, Minnesota*, 429 F.3d 1168, 1173 (2005) (stating that after *Kuha* [8] was decided in 2003, that it is always unconstitutional to use a police dog to bite and hold a suspect without giving a prior warning.); *Trujillo v. City of Lakewood, Colo.*, 2009 WL 3260724, at 4* (D. Colo. Oct. 9, 2009) ("[A] reasonable officer would be on notice that releasing a police dog, without first warning and giving a suspect the opportunity to comply, is an unconstitutionally excessive use of force."); *Whitman*, 651 F.Supp.2d at 1128-9 ("The Department's policy directs canine handlers to issue multiple verbal warnings and allow the suspect a reasonable time to surrender unless the officer is in physical danger...maintain direct control over the officer's police dog during any open area search and to account for innocent bystanders as well as circumstances that may diminish the handler's unfettered control over the dog before deploying it without a leash. Together these provisions establish constitutional guidelines for canine handlers while leaving the canine handler

---

[8] *Kuha v. City of Minnetonka*, 328 F.3d 427 (8th Cir. 2003) was originally filed in 2003, but was amended on rehearing by the panel, 365 F.3d 590 (8th Cir. 2003).

discretionary decisionmaking authority as to the manner in which a police dog is deployed…");
*Mullins v. City of Colorado Springs*, — F.Supp.3d —, 2021 WL 5919201, at *8 (D. Colo. Dec.
15, 2021) ("[t]he Court finds that [plaintiff's] right not to be attacked by a canine in these
circumstances [without hearing any warning and where officers were not in danger] was clearly
established by February 27, 2019…"). *cf. Marquez v. City of Albuquerque*, 399 F.3d 1216, 1221
(10th Cir. 2005) (Affirming the district court's judgment as a matter of law because, "a jury could
rationally reach the conclusion that [officer]…acted reasonably when, after warning [plaintiff] to
halt, he ordered his police service dog to apprehend [plaintiff]"); *Crall v. Wilson*, 769 F. App'x
573, 577 (10th Cir. 2019) (use of PSD could be reasonable where officer loudly announced that
he would deploy PSD if the occupant of the bedroom did not emerge). [9]

      Because this rule is clearly established, the issue is whether an imminent threat existed,
and that question creates an issue of fact that should be submitted to a jury. For reasons explained
above, this Court finds that there is sufficient evidence that an imminent threat did not exist. This
case is not *Thompson*. Here officers observed minor movement attributed to a cat, and that
movement inspired the deployment of a PSD into a residential neighborhood. No fences, no
safeguards, no warnings. Under the rule, Defendants needed to warn Plaintiff before deployment.

      To the extent Defendants argue that they did sufficiently warn Plaintiff, this Court
disagrees. The existing case law clearly establishes that a reasonable officer would have had fair
warning that it was unconstitutional to deploy a police service dog without warning, off lead, in a
residential neighborhood when no particular exigency justified the dog's silent deployment. The
purpose of the warning is to enable bystanders to exit the area and afford suspects an opportunity

---

[9] The Court's finding is further bolstered by case law clearly establishing that the use of force without warning or
opportunity to comply is unreasonable. *Trujillo*, 2009 WL 3260724, at 4*. (*See also Casey v. City of Federal
Heights*, 509 F.3d 1278, 1285-86 (10th Cir. 2009) (deploying a taser without warning violated clearly established
Fourth Amendment prohibitions on use of excessive force.).

to surrender. Among the existing case law, there is also an implied requirement that the warning must be sufficient to actually warn individuals within the search area. *See Vathekan*, 154 F.3d at 180 ("If a warning is not given, then a witness will not hear one. A juror could reasonably conclude that if certain witnesses did not hear a warning, then *no* warning was given, even if other witnesses testify to a warning."); *Crall*, F. App'x at 577 (not a clear case of excessive force where K-9 officer "loudly" warned all occupants of the bedroom while standing just outside of the bedroom doorway, and released PSD after hearing no response and while plaintiff was actively failing to comply with officer's orders.); *Mullins*, 2021 WL 5919201, at *6 (unreasonable use of force where officers gave verbal canine warning from front door of multi-story home, but plaintiff did not hear warning because he was upstairs and showering at the time of canine deployment.).

It naturally follows that a canine warning, intended to alert both the suspect and innocent bystanders, must be sufficient to achieve that goal. Here, it was insufficient, and unreasonable for officers to only provide one PSA thirty minutes prior to the deployment of PSD. The announcement was made while driving around a large multi-block perimeter. No evidence suggests how loud the warning was, or from how far away it could be heard. Additionally, during that PSA announcement, Defendant saw bystanders outside of their homes. This suggests that, even at the time of providing the warnings, Defendant knew that they were insufficient to achieve their goal. Neither Plaintiff, nor his immediate neighbor heard any warnings alerting them of PSD deployment and had no reason to believe that they were not allowed to exit their homes. This evidence suggests to the Court that Defendants were aware of the need for such a PSA and that they had the resources to make one. Aside from the movement likely attributed to a cat, nothing before the Court suggests that the imminent threat escalated from the time between when the PSA was given, and the time of deployment. Because there was no escalation, this Court cannot

understand why Defendants failed to provide additional warning prior PSD deployment. Especially considering Defendant knew bystanders could be outside of their homes, and with no exigency requiring silent deployment.

This Court finds that releasing a PSD off-lead into a residential neighborhood, without warning, is a clearly established constitutional violation if no imminent threat exists. *See Quinn*, 780 F.3d at 1014 (10th Cir. 2015) ("[t]he more obviously egregious the conduct in light of the prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.") (internal quotations omitted). In evaluating the totality of the circumstances, the Court finds a fact question exists as to whether there was an imminent threat, and whether the PSA provided was sufficient. This Court will not grant Defendant summary judgment on Plaintiff's excessive force claim for deployment without warning.

### 2. Second Bite

Although Defendant did not *physically* re-deploy the PSD before the second bite, he did instruct Plaintiff, at gun point, to release the PSD. Given the coercive and potentially dangerous nature of the interaction, it was reasonable for Plaintiff to comply with Defendant's instructions, which caused the second bite.

### a. Constitutional Violation

As explained above, "[a]n attack by an *unreasonably deployed* police dog in the course of a seizure is a Fourth Amendment excessive force violation." *Vathekan,* 154 F.3d at 178 (emphasis added). So, again, the Court must assess reasonableness based on the totality of the circumstances. *Estate of Larsen*, 511 F.3d at 1260. That said, the focused question here is whether it was reasonable for Defendant to have Plaintiff release the PSD once Plaintiff had the PSD by the collar.

Considering the *Graham* factors, this Court finds that it was unreasonable for Defendant to order Plaintiff's release of the PSD without first commanding the PSD to "release." Courts

prioritize the second factor discussing the immediate threat posed to officers. *See Graham*, 490 U.S. at 395. Here, Plaintiff did not pose an immediate threat.

Defendant was searching for an armed robbery suspect. The severity of the alleged crime might typically cut in favor of Defendants use of force on *Graham* factor one. But as officers approached Plaintiff, they could see that he was not the suspect, nor was he armed, resisting arrest, or threatening any officer.

Upon officers hearing Plaintiff' screams after the initial bite, officers approached. Plaintiff grabbed PSD Gino's collar to protect himself and was able to temporarily prevent the dog from biting him a second time. Officers approached with guns drawn, ordering Plaintiff to "show his hands," "get on the ground," and "let go of the dog." (Pltf's Resp. Doc. 36, ¶ CC). At this time, PSD Gino was not actively latched onto Plaintiff.  Plaintiff's defensive hold on the dog was the only thing preventing additional bites. When Plaintiff complied with Defendant's command to release the dog, he was bit again on his other thigh. Throughout this interaction multiple officers had their guns pointed at Plaintiff despite Plaintiff appearing unarmed and nonthreatening.  APD canines will only release their hold upon hearing the command "Loos." (Pltf's Resp. Doc. 36, ¶ DD).  However, it was not until officers had approached and gained physical control of PSD Gino that a command was given to release. The bites from PSD Gino left deep wounds and lacerations in both of Plaintiff's thighs.

At no point did Plaintiff attempt to flee or pose any threat to the officers. He also yelled out, "I live here, I live here," immediately notifying officers that he was a homeowner, and not the suspect.

Under the totality of the circumstances this Court finds it was unreasonable use of force to allow a second bite once officers already had guns pointed at the Plaintiff and the Plaintiff was

complying with officers' instructions. *See Kuha*, 365 F.3d at 600 ("[A] jury could properly conclude that it was objectively unreasonable for the officers to require [plaintiff] to release [canine] prior to calling off the dog."); *Kopf*, 942 at 268 ("We believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum."): *Mullins*, 2021 WL 5919201, at *9 (finding a sufficient claim to survive summary judgement for Fourth Amendment violation where officers failed to order canine to stop biting plaintiff while plaintiff was subdued, unarmed, and not posing any threat, or attempting to flee.).

### b. Clearly Established

Tenth Circuit precedent is clear that "continued use of force after an individual has been subdued is a violation of the Fourth Amendment." *Perea v. Baca*, 817 F.3d 1198, 1205 (10th Cir. 2016). And the weight of authority in other jurisdictions has clearly established that "excessive duration of [canine] bite… could constitute excessive force." [10] *Id*. (citing *Watkins v. City of Oakland, Cal*., 145 F.3d 1087, 1093 (9th Cir. 1998) (affirming the denial of qualified immunity where plaintiff raised genuine issue of material fact as to whether the force used against plaintiff, including allowing the K-9 to continue biting until plaintiff showed his hands, was reasonable under the circumstances.). Plus, although the Tenth Circuit had not specifically addressed a prolonged PSD attack before the night Plaintiff was bit, it has since recognized the weight of authority from our sister jurisdictions and concluded that "allowing a police dog to attack [an individual], after he is subdued, violates the Fourth Amendment." *Vette v. K-9 Unit Deputy*

---

[10] *See also Trammell v. Thomason* , 335 F. App'x 835, 844 (11th Cir. 2009) (unpublished) ("If a jury concludes that the officers failed to stop the attack promptly after they became aware that [plaintiff] was not the suspect, [clearly established law] compels the conclusion that [officer] engaged in an obvious violation of [plaintiff's] rights by failing to stop [canine] attack."); *Trujillo*, 2009 WL 3260724, at *4 (concluding that it was clearly established that the use of force on a subdued individual posing no obvious threat (*ie*: allowing canine to bite plaintiff again after he was subdued) was not warranted under the circumstances.).

*Sanders*, 989 F.3d 1154, 1172 (10th Cir. 2021). For these reasons, this Court will not grant Defendant summary judgment on Plaintiff's excessive force claim for the second bite.

### 3. Entry and Search of Plaintiff's Residence

#### a. Constitutional Violation

The Fourth Amendment expressly protects the right of the people "to be secure in their…houses…against unreasonable searches and seizures." U.S. Const. amend. IV. "Inasmuch as the purpose of the Fourth Amendment is to guard against arbitrary governmental invasions of the home, the necessity of prior judicial approval should control any contemplated entry, regardless of the purpose for which that entry is sought." *Payton v. New York*, 445 U.S. 573, 585-86 (1980). "A warrantless search of a home is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).

These exceptions include consent, exigent circumstances, hot pursuit, and protective sweep. *See Payton*, 445 U.S. at 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *U.S. v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (holding that officers must receive either express or implied consent, and that consent must be freely given); *United States v. Santana*, 427 U.S. 38, 42 (1976) (holding generally that "hot pursuit" requires the government agent to have probable cause to believe the fugitive is inside of the dwelling to be searched); *United States v. Bagley*, 877 F.3d at 1153-54 (10th Cir. 2017) (holding that protective sweeps of the home require "specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house."). The parties do not dispute that the warrantless entry here was a constitutional violation unless an exception to the warrant requirement rule applied. The targeted

question is whether a warrant exception excused Defendants' entry. Defendant argues that multiple exceptions applied. This Court disagrees.

### i. Consent

Voluntary consent requires (1) that law enforcement officers receive either express or implied consent, and (2) that the consent be given freely and voluntarily. *Jones*, 701 F.3d at 1317 (10th Cir. 2012) (*citing Florida v. Royer*, 460 U.S. 491, 497, (1983) "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."). Where consent is given, "[t]he scope of the consent determines the scope of the search." *U.S. v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (citation omitted). In determining the scope of an individual's voluntary consent, "[the question is] what a reasonable person would have understood by the exchange between the defendant and police officer." *Id*. (citation omitted).

No evidence in the record suggests that Plaintiff gave officers voluntary consent to enter or search his home. Lapel footage shows that Plaintiff repeatedly asked officers if he could lock up his own house and secure his own dog before going to the hospital. He also offered to go with officers to do the same. Officers declined his request. Plaintiff also provided a sworn statement stating: "At no point did I give any APD officer permission to go inside my house." Without any clearly contradictory evidence to refute the lapel footage or Plaintiff's statement, the only evidence before the Court supports a finding that Plaintiff did not consent.

### ii. Community Caretaking

"[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute.'" *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (citing *Cady v. Dombrowsky*, 413 U.S. 433, 441 (1973)). That said, the community caretaking exception has historically been "applicable only in cases involving automobile searches." *U.S. v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994). There is an established "constitutional difference" between warrantless searches of automobiles and searches of homes under the community caretaking doctrine. *See Cady*, 413 U.S. at 442 ("The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband."). In the wake of *Cady*, Courts have consistently refused to expand the automobile exception to warrantless searches of the home. *See Collins v. Virginia*, 584 U.S. — , — (2018) ("Expanding the scope of the automobile exception in this way would both undervalue the core Fourth Amendment protection afforded to the home and its curtilage and untether the automobile exception from the justifications underlying it.") (internal quotation marks and citation omitted). Under the facts of this case, the community caretaking exception does not apply. *See Caniglia v. Strom*, 141 S.Ct. 1597, 1600 (2021).

### iii. Hot Pursuit

Warrantless entry is permitted where officers are involved in the "ongoing hot pursuit of a fleeing suspect." *United States v. Cruz*, 977 F.3d 998, 1009 (10th Cir. 2020) (quoting *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010)). Hot pursuit exists where an officer "is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." *Id*. (citation omitted). Beyond that, the officer must typically have probable cause to believe the fugitive is inside of the dwelling to be searched. *See Santana*, 427 U.S. at 42 (1976) (Hot pursuit justified where police

pursued suspect into her home after seeing her retreat inside the dwelling holding destructible evidence.).

From the evidence provided, nothing suggests that officers were in immediate or continuous pursuit as defined by relevant case law. None of the officers saw the described suspect enter the home, nor had they received any information that the suspect had entered the dwelling. Before the first bite occurred, and before entering Plaintiff's home, officers lost sight of the suspect midblock between Dakota and California Street. Shortly thereafter, Defendant, standing with several other officers, deployed PSD Gino to search areas near Plaintiff's home. Further, Plaintiff gave officers no reason to believe that he was a "friendly," or that the suspect may be inside of his home. Officers had no more reason to believe the suspect was in Plaintiff's home over any other home on the block. To suggest that officers were justified in the entry of Plaintiff's home would effectively eviscerate the protections of the Fourth Amendment and allow officers to search any home just because a suspect was seen in its vicinity.

Additionally, after taking Plaintiff into custody, Defendant announced over the radio that APD had a homeowner who had stepped outside of his house in custody, and that the homeowner did not appear to be the suspect. (Def's UMF ¶ 65, Doc. 20). No evidence suggests that officers believed Plaintiff to be the suspect or that the suspect was otherwise in Plaintiff's home. Absent that evidence, this Court will not permit a search in this circumstance. The hot pursuit exception does not apply.

### iv.  Protective Sweep

 "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). *Buie* "allow[s] protective sweeps in two situations." *Bagley*, 877 F.3d at 1153. The first

situation allows police, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. In the second situation, police may conduct a "protective sweep" beyond areas immediately adjoining the arrest if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 335.

Given that officers apprehended Plaintiff outside of his home, the search falls under the second situation. Officers could only conduct a protective sweep if they were acting on articulable facts and rational inferences, which would cause a reasonably prudent officer to believe a dangerous person was inside of the home. For many of the reasons stated above, Defendants have failed to present any articulable facts supporting a reasonable belief that the suspect either entered or remained in the house. *See Bagley*, 877 F.3d at 1157 (*quoting United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) ("[a] protective sweep cannot be based on the possibility that a dangerous person could be concealed without specific, articulable facts that someone was concealed")). Without those facts, any generalized concern that the suspect was inside, without more, does not justify Defendants' warrantless entry. *See Bagley*, 877 F.3d at 1156 ("[a] protective sweep cannot be based on the possibility that a dangerous person could be concealed without specific, articulable facts that someone was concealed") (citation omitted). The protective sweep exception does not apply.

Because none of the four exceptions apply, this Court will not grant Defendant's summary judgment on Plaintiff's search claim.

### b.  Clearly Established

Despite the Court's individualized analysis regarding the constitutional violation of the entry and search of Plaintiff's home, it must still determine whether the violation was clearly established at the time the infringement occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

 The touchstone of the Fourth Amendment is reasonableness. *Katz v. United States*, 389 U.S. 347, 360 (1967). "[T]he precedent of the Supreme Court is quite clear that that a warrantless search is reasonable only when it falls within one of the clearly established exceptions to the warrant requirement." *Bute*, 43 F.3d at 534. Clearly established law gave officers fair notice that their entry into Plaintiff's home, without a warrant or consent, and without any articulable information supporting exigent circumstances, was unlawful.

A right is clearly established when our precedent encompasses "'materially similar conduct' or 'applies with obvious clarity' to the conduct at issue." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017*) (quoting Est. of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016)). That said, the Tenth Circuit does not require plaintiffs to hunt for cases with identical facts. *Casey v. City of Fed. Heights*, 509 F.3d, 1278, 1284 (10th Cir. 2007). Instead, the Circuit only asks whether the existing law provides fair warning to a defendant*. Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020).

It is clearly established that entry and search without a warrant, consent, or articulable facts justifying such conduct, violates an individual's rights. *See Payton*, 445 U.S. at 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Jones*, 701 F.3d at 1317 (holding that officers must receive either express or implied consent, and that consent must be freely given); *Santana*, 427 U.S. at 42 (holding generally that "hot pursuit" requires the

government agent to have probable cause to believe the fugitive is inside of the dwelling to be searched); *Bagley*, 877 F.3d at 1153-54 (holding that protective sweeps of the home require "specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house."). The Court finds that a reasonable officer would have known that entry without a warrant, consent, or exigent circumstances was impermissible.

As described above, Defendant's entry and search was without warrant, consent, or exigent circumstances justifying hot pursuit, community caretaking, or a protective sweep. Thus, Defendant is not entitled to qualified immunity and summary judgment is denied on this issue.

### B.   Sovereign Immunity is Waived for Plaintiff's State Law Claims.

Defendants also seek summary judgement on Plaintiff's claims for false arrest, false imprisonment, battery, and negligence resulting in those offenses. (Doc. 1-1).  NMSA 1978, § 41-4-12 of the New Mexico Tort Claims Act ("NMTCA"), "provides a waiver of immunity for certain torts committed by law-enforcement officers and for negligence that causes a specified tort." *Lymon v. Aramark Corp.*, 728 F. Supp. 2d 1222 (D.N.M. 2010). New Mexico law enforcement officers are subject to these types of claims when acting within the scope of their duties and when their actions are unlawful and unprivileged. *See* NMSA 1978, § 41-4-12. Additionally, "absent a claim that officers were acting outside the scope of their authority, the Police Department may be held vicariously liable for any alleged torts committed by the officers for which immunity has been waived." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dept.*, 1996-NMSC-021, ¶¶ 21-22, 121 N.M. 646, 651.

### 1.   False Imprisonment and Arrest

"The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so…A

false arrest is merely one way of committing false imprisonment." *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 12, 143 N.M. 84, 88 (citations omitted). Under New Mexico common law, "when a police officer has reasonable grounds or probable cause to believe that an offense has been committed in his presence, his warrantless arrest does not become unlawful if the arrestee is later found to be innocent." *State v. Johnson*, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 701. "Reasonable grounds or probable cause exists when, at the moment the arrest was made, the facts and circumstances within [an officer's] knowledge were sufficient to warrant a prudent man in believing that [the accused] had committed or was committing an offense." *Id.* (citation and punctuation omitted).

Plaintiff was seized the moment that PSD Gino bit his leg. At that time, neither Defendant, or any other officer had any reason to believe Plaintiff had committed or was committing any offense. In fact, officers were not even aware of his presence when PSD Gino was deployed. Defendants argue that they had "an objectively reasonable good faith belief based upon the totality of the circumstances. . . to seize Plaintiff.," claiming that they are entitled to a judgment as a matter of law against Plaintiff's false arrest and false imprisonment claims. (Doc. 20 at 49). This Court disagrees. Plaintiff complied with the officers' directions and did not match the suspect's description. At that time, neither Defendant, nor any other officer had reason to believe Plaintiff had committed or was committing any offense. In fact, officers radioed in that they had a homeowner in custody who "did not appear to be the suspect." (Pltf's Resp. ¶ GG, Doc. 36). Defendants are not entitled to judgment as a matter of law on this issue.

### 2.  Battery

As to Plaintiff's battery claim, the Court has found that Plaintiff has sufficiently made out a claim for excessive force, which is not reasonable force. "[A] claim for excessive force has been

recognized as essentially a claim of the common law tort of battery, for which the NMTCA does waive immunity." *Cordero v. Froats*, 2015 WL 10990332 (D.N.M. Jan. 9, 2015). Additionally, New Mexico courts have held that "[t]he elements of civil and criminal assault and battery are essentially identical" *State v. Ortega*, 1992-NMCA-003, ¶ 12, 113 N.M. 437, 440. An individual commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *Sanchez v. Baker*, 457 F. Supp. 3d 1143, 1161 (D.N.M. 2020) (citing *Ortega*, 1992-NMCA-003, ¶ 12). From the facts provided, Plaintiff has sufficiently demonstrated that Defendant intended to cause a harmful contact by deploying PSD Gino, and that harmful contact occurred. Given that there is no dispute to this issue, Defendants are essentially arguing that they are nevertheless entitled to summary judgment under the NMTCA for the same reason they are entitled to qualified immunity for their use of force. For the same reasons explained in the qualified immunity analysis, this Court finds that a genuine issue of material fact exists as to whether officers used excessive force, which precludes summary judgment on this claim as well.

**THEREFORE,**

　　**IT IS ORDERED** that Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint, (Doc. 20), is **DENIED**. The Court finds that Officer McPeek is not entitled to qualified immunity and that sovereign immunity is waived under the New Mexico Tort Claims Act for Plaintiff's state law claims.

_____
UNITED STATES DISTRICT JUDGE